**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**JEFFERY L. JONES,**

      **Plaintiff,**

**vs.**                          **Case No. 1:09cv241-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be affirmed in part as to the determination of Plaintiff's residual functional capacity, but reversed and remanded to obtain evidence from a vocational expert for the period claimed, July 28, 2005, to October 21, 2007.

**Procedural status of the case**

Plaintiff, Jeffery L. Jones, applied for supplemental security income benefits. Plaintiff alleges disability due to blindness in one eye, poor vision, deafness in one ear

with poor hearing, chronic uncontrolled hypertension, chronic obstructive pulmonary disease, repeated hernias, and chronic pain disorders, with onset on June 1, 2003. Plaintiff was 52 years old at the time alleged onset, has a 12th grade education, and has past relevant work as a log truck driver.

The Administrative Law Judge found that Plaintiff has the residual functional capacity to do light work with restrictions.  R. 21.  He found that Plaintiff was no longer able to perform his past relevant work as a truck driver.  R. 24.  The ALJ determined that Plaintiff, age 52 on the onset date, was "closely approaching advanced age."  R. 24.  Relying upon the "grids,"[1] the ALJ found that Plaintiff was not disabled prior to October 21, 2007.  *Id.*  On October 21, 2007, when Plaintiff became 57 years of age, he changed to the status of "advanced age" and the "grids" directed a finding of disabled due to his education and lack of transferrable skills.  *Id.*  Consequently, the ALJ rendered a partially favorable decision commencing on October 21, 2007.

Plaintiff contends that the onset of disability should have been July 28, 2005, the date of a consultative examination by Eftim Adhami, M.D.  This case, therefore, seeks supplemental security income benefits for a closed period of July 28, 2005, to October 21, 2007.

**Legal standards guiding judicial review**

The court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

---

[1] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at: <u>http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm</u>

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

 The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or
      equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past
      relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

The hearing was held on August 24, 2007.  R. 179.  Plaintiff's attorney said at the

outset that Plaintiff had to stop work as a truck driver due to hypertension.  *Id*.  He noted

that Plaintiff's hypertension continued to be uncontrolled, and he had no hearing in his

left ear, though he did "okay with conversational speech."  *Id*.  It was also noted that

Plaintiff now has a hernia and cannot do any lifting.  *Id*. and R. 180.

Plaintiff testified that he had last seen a physician for hypertension "back in

June."  R. 181.  He was no longer taking blood pressure medicine because he had run

out.  *Id*.  He said hypertension caused dizziness in hot weather and headaches.  *Id*.  He

said that he had fainted three times in the woods.  R. 185.  Plaintiff said he cannot hear

anything in his left ear.  R. 185.  He described problems that he has in hearing speech.

R. 186.  Plaintiff also said he had back pain and arm pain, R. 186-187, and a hernia.  R.

181.  He said he cannot do any lifting.  R. 182.  Later he said he thought he could lift ten

pounds.  R. 184.  He thought he could stand for 15 to 20 minutes and sit for 30 minutes

to an hour.  *Id*.

Plaintiff previously worked as a log truck driver.  R. 183.  He feels it would now

be dangerous to drive a car.  R. 185.

**Medical evidence**

On August 8, 2003, Plaintiff was examined by Kenneth Wise, M.D.  R. 111.

Plaintiff complained of bilateral shoulder pain for several months.  *Id*.  He reported it had

been getting worse and was worse on the right side. *Id.* Plaintiff also reported that he had been experiencing some headaches and light-headed spells. *Id.* It was noted that Plaintiff had come in for treatment two years earlier for high blood pressure. *Id.* On examination, Dr. Wise found that Plaintiff's blood pressure was 182 over 100. *Id.* He noted minimal crepitus in Plaintiff's right shoulder, and "subjective increase in pain with motion of the shoulders." *Id.* Dr. Wise's assessment was hypertension and bilateral shoulder pain. *Id.*

On August 22, 2003, Plaintiff returned to Dr. Wise for a followup for his hypertension and shoulder pain. R. 110. The shoulder pain had improved for five or six days on Celebrex, but his shoulders were again hurting. *Id.* Dr. Wise noted that Plaintiff did "a lot of lifting at work." *Id.* It was also noted that Plaintiff was not having "any headaches, dizzy spells or shortness of breath," and was not having any neck pain. *Id.* His blood pressure was 184 over 94. *Id.* Plaintiff had diminished hearing. *Id.* Plaintiff's shoulder was only slightly tender to palpation, with no significant crepitus. *Id.* Dr. Wise's diagnosis was persistent shoulder pain and hypertension. *Id.*

On June 25, 2004, handwritten medical notes indicate that Plaintiff was to have had an MRI of his left shoulder and a carotid angiogram, but he could not afford the procedures. R. 168. On July 30, 2004, it was again noted that Plaintiff could not afford an MRI and a carotid angiogram. *Id.*

On April 4, 2005, Plaintiff was admitted to the emergency room of the Nature Coast Regional Hospital in Williston, Florida. R. 118. He had bumped his head on the stairs at home, and might have suffered a "near syncope before or slightly after." *Id.* A

chest x-ray revealed moderate cardiomegaly and one to two plus congestive heart failure. R. 119. The diagnosis by Richard Martin, M.D., was bradycardic episode, congestive heart failure, a history of hypertension, and mild chronic renal failure. *Id.* Dr. Martin thought that Plaintiff "was really asymptomatic after admission" and he was asymptomatic when he was discharged. *Id.*

On July 28, 2005, Plaintiff was examined on a consultative basis by Eftim Adhami, M.D. R. 130-131. Plaintiff reported that he could not work due to bad eyesight and hearing, left thigh pain, breathing problems, and occasional wheezing. R. 130. His illnesses listed were hypertension, stroke, decreased hearing, and bradycardia. *Id.* Plaintiff's reading ability was found to be good without glasses. *Id.* He was found to speak well but could not hear well, and needed "loud talking." *Id.* Plaintiff admitted that he heard with hearing aids, but his hearing aids were then being repaired. *Id.* He had clear respiration. *Id.* Muscle strength was intact and there was no muscle atrophy. *Id.* There was no lumbar paravertebral muscle spasm, and the straight leg raising test was negative for back pain. *Id.* Plaintiff had some knee pain on flexion, but his walk was normal. *Id.* Dr. Adhami's diagnosis was that Plaintiff had decreased hearing, but could hear almost normally when hearing aids are used. *Id.* It was noted that Plaintiff said that he experiences shortness of breath (SOB) when he works in the yard, and that "spirometry showed a mild tendency for an obstructive defect, probably due to a history of smoking." R. 130-131. It was thought that he had early COPD findings. R. 131. It was thought that Plaintiff's shortness of breath might be due to "a certain degree of ventricular dysfunction due to" hypertension. *Id.* It was thought that the fainting episode

which had brought Plaintiff to the emergency room had been due to bradycardia caused by digoxin intoxication based on the ECG results, and that this could be avoided in the future by adjustment of medication. *Id.* It was noted by Dr. Adhami that Plaintiff's hypertension was not well controlled and he needed better adjustment of medication. *Id.*

Plaintiff's hearing was tested on October 19, 2005. R. 139-140. His hearing aid was checked and was functioning properly. R. 140. The tester thought that Plaintiff's responses were not reliable. *Id.* It was noted that Plaintiff's reception of speech at 70dBHL (a level significantly lower than the pure tone average on the test) caused responses "without hesitation," indicating that Plaintiff heard and understood speech at that level. *Id.*

On March 14, 2006, Lance Chodosh, M.D., performed a consultative examination of Plaintiff. R. 149. Plaintiff told Dr. Chodosh that he had experienced chronic and worsening non-radiating upper lumbar pain for many years. *Id.* He asserted that he could not sit or stand for long periods of time due to pain, but no diagnosis had been established. *Id.* Plaintiff said that he had rare episodes of non-radiating mid-anterior chest pain of an unspecified nature, lasting one to two days. *Id.* Plaintiff said he had stopped driving trucks a year earlier because his blood pressure had gotten too high. *Id.* In the section marked "functional status," Dr. Chodosh said that Plaintiff was independent in activities of daily living, could walk only two blocks, or stand or sit for 10 minutes, due to pain. R. 150. It was noted that Plaintiff had poor vision and poor hearing. *Id.* Plaintiff seemed to be neither ill nor vigorous. *Id.* His blood pressure was

210 over 110. *Id.* He displayed mild pain behavior. *Id.* Hearing was found to be moderately impaired, despite use of a hearing aid on the right. *Id.* Plaintiff's eyesight was found to vary from 20/50 to 20/30. *Id.* No cardiac enlargement was evident, and heart sounds were regular. R. 151. Both hands showed signs of use, with callus and grime. *Id.* All joints had full range of motion. *Id.* Examination of Plaintiff's back revealed no deformity, tenderness or paraspinal muscular spasm, and straight leg raising was negative supine and seated, bilaterally, limited by Plaintiff's hamstrings. *Id.* Plaintiff's standing balance was normal, his gait was slow but normal, and he was able to squat and to rise. R. 152. Dr. Chodosh's impression was hypertension, severe, currently without treatment and "clearly high enough to prevent certification for truck driving." *Id.* With respect to back pain, Dr. Chodosh found no obvious physical signs of impairment. *Id.* Dr. Chodosh said that Plaintiff's hearing loss was at least moderate in severity, but Plaintiff was able to communicate with other people. *Id.* Dr. Chodosh concluded that Plaintiff was able to speak normally, his hearing and vision were moderately impaired, he could stand and walk to a moderate extent but not extensively, he could sit normally, he could occasionally stoop, and he could lift and carry moderate weight briefly and occasionally. *Id.* He thought that Plaintiff was able to comprehend and follow directions, and could travel. *Id.*

Plaintiff had another hearing test on April 17, 2006. R. 156-157. The results showed total hearing loss in the left ear and profound loss in the right hearing. The tester said: "This loss will cause all speech and environmental sounds to be inaudible." R. 157.

On June 1, 2006, Plaintiff was examined on a consultative basis by Robert A. Greenberg, M.D. R. 158. Dr. Greenberg noted that testing had shown significant bilateral hearing impairment, but said that "during my evaluation the patient appeared to be able to hear normal conversational speech," and he had guarded against lip reading. *Id.* Dr. Greenberg observed scarring of the left tympanic membrane in the left ear. *Id.* The right ear drum was normal. *Id.* Dr. Greenberg said: "The patient appeared to have very mild decrease in his hearing but was able to hear normal, conversational speech, with guarding for lip reading." *Id.* His impression was hypertension and mild hearing loss. *Id.*

On May 18, 2007, Plaintiff went to the emergency room of a hospital due to hernia pain. R. 170. He was unable to afford a truss and had no insurance for surgery. *Id.* He apparently said he had been doing yard work, but could not continue such work due to pain. *Id.* Some mild lumbar tenderness was noted. *Id.* His blood pressure was elevated, 192 over 96, and it was noted that he had not been compliant with his medications. *Id.* He had taken his last blood pressure medication a week earlier. *Id.*

**Legal analysis**

**Whether the ALJ should have found that Plaintiff's residual functional capacity on July 28, 2005, limited him to sedentary work**

This argument is directed to the ALJ's residual functional determination. Plaintiff argues that the substantial evidence in the record required the ALJ to find that he could not perform a full range of light work prior to October 21, 2007, that is, he could only do sedentary work. Doc. 17, p. 6. If Plaintiff had been found to be limited to sedentary work in the earlier period commencing on July 28, 2005, Medical Vocational Rule

201.14 would have directed a finding of disability. *Id.* That Rule in the "grids" directs a finding of disability when a person is closely approaching advanced age, as Plaintiff was after July 28, 2005, has a high school or more education, is skilled or semi-skilled but the skills are not transferrable, and is limited to sedentary work.

To support the argument that the ALJ erred in not finding Plaintiff limited to sedentary work prior to October 21, 2007, Plaintiff notes that he was examined on a consultative basis on July 28, 2005, by Dr. Adhami and found to have exactly the same impairments as he did on October 21, 2007; that is, hearing loss, vision problems, pain disorder, essential hypertension, chronic obstructive pulmonary disease, and a history of hernia. From this Plaintiff argues that the onset of disability should have been July 28, 2005.

This argument is not persuasive. As noted by the ALJ, on the alleged onset date, July 28, 2005, Dr. Adhami found that Plaintiff had no lumbar spasms, the straight leg raising test was negative for back pain, Plaintiff had normal motor strength, could pick up small objects, could walk normally, and reported that he could hear well with hearing aids. R. 20. The ALJ also observed that on March 16, 2006, Dr. Chodosh said that Plaintiff had full range of motion of all joints, straight leg raising was negative, motor strength and sensory examinations were essentially normal, Plaintiff could walk, though slowly, could squat and rise, could lift about 25 pounds, and was independent in activities of daily living. R. 20-21.

These findings for the period prior to October 21, 2007, are supported by substantial evidence in the record, R. 130-131, 151-152, and support the ALJ's

conclusion that Plaintiff is capable of doing more than sedentary work. Indeed, the

ALJ's residual functional capacity assessment that Plaintiff is capable of light work with

the limitations assigned is supported by substantial evidence in the record, and that

determination should be affirmed. Consequently, the ALJ did not err in failing to rely

upon Medical Vocational Rule 201.14, which by its terms only applies when the claimant

is capable of only sedentary work.

### Whether the "grids" could be use for the disability determination prior to October 21, 2007, due to the existence of nonexertional impairments

Plaintiff argues that a vocational expert was needed to determine disability prior

to October 21, 2007, because he had nonexertional impairments, making the "grids"

inapplicable. Doc. 17, pp. 7-8. Plaintiff contends that he has the following

nonexertional impairments which prevent him from performing a full range of light work:

uncontrolled hypertension with dizziness and headaches, vision and hearing

impairments, and chronic back pain. *Id.*, p. 8. Plaintiff contends that a remand is

needed to obtain evidence from a vocational expert. *Id.*

"The general rule is that after determining the claimant's RFC and ability or

inability to return to past relevant work, the ALJ may use the grids to determine whether

other jobs exist in the national economy that a claimant is able to perform." Phillips v.

Barnhart, 357 F.3d 1232, 1142 (11th Cir. 2004). "[E]xclusive reliance on the grids is not

appropriate either when [a] claimant is unable to perform a full range of work at a given

residual functional level or when a claimant has non-exertional impairments that

significantly limit basic work skills." *Id.*, *quoting* <u>Francis v. Heckler</u>, 749 F.2d 1562, 1566 (11th Cir. 1985).

A "full range of employment" means an ability to do unlimited types of work at a given exertional level. <u>Phillips v. Barnhart</u>, 357 F.3d at 1142. "Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.*, n. 11 (citations omitted). If the claimant cannot perform a full range or unlimited types of work at a given level of exertional limitations, "then the ALJ must consult a vocational expert to determine whether there are sufficient jobs at the sedentary work level within the national economy that [a claimant] can perform." *Id.*

If a claimant can perform a "full range of employment" at the given exertional level, "the ALJ next must determine to what extent [the claimant's] nonexertional limitations affect her ability to secure employment at the sedentary work level in the national economy." 357 F.3d at 1142-1143. "When considering [the claimant's] nonexertional limitations, the ALJ need only determine whether [the claimant's] nonexertional impairments significantly limit her basic work skills."[2] *Id.*, at 1143. This means whether the limitations "prohibit a claimant from performing 'a *wide* range' of work at a given work level." *Id.* (emphasis by the court). If the nonexertional limitations significantly limit the claimant's basic work skills at the assigned exertional level, the ALJ must consult a vocational expert. *Id.*

---

[2] The court noted that some of its decisions seemed to blur the distinction between exertional limitations and nonexertional limitations, but relied on earlier decisions which made the distinction. *Id.*, at 1143, n. 14.

In <u>Marbury v. Sullivan</u>, 957 F.2d 837 (11th Cir. 1992), the ALJ found that the claimant could do a "wide range of light work." 957 F.2d at 839. He also found that the claimant could not work around dangerous machinery or at unprotected heights. *Id.* The court held that, in light of this latter finding, a remand was required:

> Under the ALJ's findings it is evident that claimant was not able to do *unlimited* types of light work, because he was precluded from work around unprotected heights or dangerous moving machinery. Expert testimony was therefore required to determine whether Marbury's limitations were severe enough to preclude him from performing a wide range of light work. An ALJ's conclusion that a claimant's limitations do not significantly compromise his basic work skills or are not severe enough to preclude him from performing a wide range of light work is not supported by substantial evidence unless there is testimony from a vocational expert. It was therefore error to rely upon the grids.

*Id.* (emphasis by the court, citation omitted). Likewise, in <u>Phillips v. Barnhart</u>, the court remanded for vocational testimony because the claimant was limited to sedentary jobs that did not involve multi-tasking. 357 F.3d at 1244. Further, the court found a remand was needed because the ALJ had not explicitly discussed the extent of limitations imposed by fibromyalgia and Sjögren's syndrome, "severe" impairments (at step 2) that he had found to exist.

In the case at bar, the only finding by the ALJ concerning the propriety of using the grids was the following: "However, the additional limitations had little or no effect on the occupational base of unskilled light jobs." R. 25. The ALJ did not explain what he meant by "the additional limitations," but he probably meant the limitations that he had determined in the assigned residual functional capacity. The ALJ determined that Plaintiff can do light work but:

. . . can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant should avoid concentrated exposure to noise, fumes, odors, dusts, gases, and poor ventilation. He should avoid even moderate exposure to moving machinery and heights.

R. 21.

I cannot see a distinction between the remands in <u>Marbury</u> and <u>Phillips</u> and the circumstance presented here. While there may have been light unskilled jobs that Plaintiff might have been able to do prior to October 21, 2007, and still avoid noise, fumes, odors, dusts, gases, poor ventilation, machinery, and heights, a vocational expert should be consulted to identify such jobs.

**Conclusion**

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** as to Plaintiff's residual functional capacity, but be **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) to obtain vocational expert evidence and to reconsider the application for benefits for the period July 28, 2005, to October 21, 2007, in light of the vocational evidence.

**IN CHAMBERS** at Tallahassee, Florida, on August 12, 2010.

s/     **William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## **NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**